THERESA M. TRABER (SBN 116305)
LAUREN TEUKOLSKY (SBN 211381)
REBECCA PETERSON-FISHER (SBN 255359)
MARISA HERNANDEZ-STERN (SBN 272477)
Traber & Voorhees
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9611
Facsimile: (626) 585-1400
tmt@tvlegal.com
lt@tvlegal.com
rpf@tvlegal.com
mhs@tvlegal.com

Attorneys for Plaintiffs Franklin Quezada, *et al.*

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### EASTERN DIVISION

| | |
|---|---|
| FRANKLIN QUEZADA, et al.,<br><br>　　　　　Plaintiffs,<br><br>　　v.<br><br>SCHNEIDER LOGISTICS TRANSLOADING & DISTRIBUTION, INC., et al.,<br><br>　　　　　Defendants. | Case No. CV 12-2188 CAS (DTBx)<br><br>**PLAINTIFFS' NOTICE OF MOTION AND UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT**<br><br>Date:　　　December 2, 2013<br>Time:　　　10:00 a.m.<br>Judge:　　　Hon. Christina A. Snyder |

# NOTICE OF MOTION AND MOTION

PLEASE TAKE NOTICE that on December 2, 2013, at 10:00 a.m., or as soon thereafter as the matter may be heard by Judge Christina A. Snyder of the United States District Court of the Central District of California, 312 N. Spring Street, Los Angeles, CA 90012, in Courtroom 5, plaintiffs Franklin Quezada, Elizabeth Gutierrez, Victor Ramirez, and Walter Downing, individually and on behalf of all others similarly situated, will and hereby do move the Court pursuant to Federal Rules of Civil Procedure 23 for an order: (1) preliminarily approving the proposed class action settlement; (2) provisionally certifying the settlement class and confirming the appointment of the class representatives and class counsel; (3) approving and directing dissemination of the notice and claim form to class members; and (4) adopting the proposed schedule for the final approval process.

In terms of compliance with C.D. Local Rule 7-3, the parties contemplated the filing of this motion in their Settlement Agreement.  Schneider's counsel has had the opportunity to review this motion in its entirety before filing, and has represented that Schneider will file a statement of non-opposition.  Declaration of Lauren Teukolsky in Support of Plaintiffs' Unopposed Motion for Preliminary Approval ("Teukolsky Decl.") Decl. ¶2.

This motion is based on: the accompanying Memorandum of Points and Authorities, the Teukolsky Declaration and exhibits, the declarations of Franklin Quezada, Victor Ramirez, Elizabeth Gutierrez and Walter Downing, the Court file in this action, and such other matters as the Court may consider.

Dated:  November 13, 2013                     Respectfully submitted,

                                             TRABER & VOORHEES

                                   By:    /s/ Lauren Teukolsky
                                          Lauren Teukolsky
                                          Attorneys for Plaintiffs

# TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES.............................................. iii

MEMORANDUM OF POINTS AND AUTHORITIES........................ 1

I.      INTRODUCTION............................................. 1

II.     FACTUAL BACKGROUND...................................... 1

A.      Summary of the Lawsuit................................... 1

B.      Motion Practice and Discovery.............................. 2

C.      The Parties Engaged in Extensive Mediation and Settlement Efforts........ 3

III.    SUMMARY OF THE SETTLEMENT.............................. 4

A.      The Class Settlement Fund................................. 4

C.      The Non-Monetary Settlement Terms. ........................ 5

D.      Limited Publicity of the Parties' Settlement.................... 6

IV.     LEGAL ANALYSIS.......................................... 6

A.      Standards Governing Preliminary Approval of a Class Settlement.......... 6

B.      The Court Should Grant Preliminary Approval to the Settlement.......... 7

        1.      The Settlement Is Well "Within the Range of Possible Approval"..... 7

        2.      The Settlement Resulted From Extensive, Informed Negotiations. ... 11

        3.      The Settlement has no Obvious Deficiencies..................... 11

                a.      The Service Awards to the Named Plaintiffs are
                        Reasonable........................................ 12

                b.      The Requested Attorneys' Fees are Reasonable. ............ 13

                c.      The Release is Narrowly Tailored to the Class Claims........ 14

C.      The Court Should Provisionally Certify the Settlement Class............ 14

        1.      The Proposed Class is Sufficiently Numerous.................... 15

        2.      Common Issues of Law and Fact Predominate. ................. 15

                a.      The Overtime Claim - AWS............................ 16

b.    The Fraudulent Misrepresentation Claim. . . . . . . . . . . . . . . . . 17

c.    The Rest Break Claim.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

d.    The Meal Break Claim. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

e.    The Reporting Time Pay Claim. . . . . . . . . . . . . . . . . . . . . . . . . 20

f.    The Inaccurate Record-Keeping Claim. . . . . . . . . . . . . . . . . . . 21

g.    The Derivative Claims Should Also Be Certified. . . . . . . . . . . 22

3.    The Claims of the Named Plaintiffs Are Typical.. . . . . . . . . . . . . . . . 22

4.    The Class Representatives and Counsel Are Adequate. . . . . . . . . . . . 22

5.    Class Certification is Proper Under Fed. R. Civ. P. 23(b)(3).. . . . . . . . 23

D.  The Court Should Order Distribution of the Proposed Notice to the

Class. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

E.  The Court Should Set a Final Approval Hearing. . . . . . . . . . . . . . . . . . . . 24

V.  CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page(s)**

*Barbosa v. Cargill Meat Solutions Corp.*,
    2013 U.S. Dist. LEXIS 93194 (E.D. Cal. July 2, 2013). . . . . . . . . . . . . . . 13, 23

*Cicero v. DirecTV, Inc.*,
    2010 U.S. Dist. LEXIS 86920 (C.D. Cal.  July 27, 2010). . . . . . . . . . . . . . . 13

*Class Plaintiffs v. Seattle*,
    955 F.2d 1268 (9th Cir. 1992). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Custom LED, LLC v. eBay, Inc.*,
    2013 U.S. Dist. LEXIS 122022 (N.D. Cal. Aug. 27, 2013). . . . . . . . . . . 12, 14

*Eisen v. Carlisle & Jacquelin*,
    417 U.S. 156 (1974). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Escano v. Kindred Healthcare Operating Co.*,
    2013 U.S. Dist. LEXIS 29899 (C.D. Cal. Mar. 5, 2013). . . . . . . . . . . . . . . . 19

*Espinoza v. Domino's Pizza, LLC*,
    2012 U.S. Dist. LEXIS 160641 (C.D. Cal. Nov. 7, 2012). . . . . . . . . . . . . . . 12

*In re First Alliance Mtg. Co.*,
    471 F.3d 977 (9th Cir. 2006). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Gooch v. Life Investors Insurance Co. of America*,
    672 F.3d 402 (6th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hanlon v. Chrysler Corp.*,
    150 F.3d 1011 (9th Cir. 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 15, 23

*Ingalls v. Hallmark Retail, Inc.*,
    2009 U.S. Dist. LEXIS 131078 (C.D. Cal. Oct. 16, 2009).. . . . . . . . . . . . . . 13

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

*Jordan v. Los Angeles County*,
  669 F.2d 1311 (9th Cir. 1982). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

*Lamb v. Bitech, Inc.*,
  2013 U.S. Dist. LEXIS 109875 (N.D. Cal. Aug. 5, 2013). . . . . . . . . . . . . . 7, 15

*Mangold v. California Public Utilities Commission*,
  67 F.3d 1470 (9th Cir. 1995). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Mercury Interactive Corp. Sec. Litigation v. Mercury Interactive Corp.*,
  618 F.3d 988 (9th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Monterrubio v. Best Buy Stores, L.P.*,
  2013 U.S. Dist. LEXIS 68647 (E.D. Cal. May 13, 2013). . . . . . . . . . . . . . 7, 11

*National Rural Telecommunications Cooperative  v. DIRECTV, Inc.*,
  221 F.R.D. 523 (C.D. Cal. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Ordonez v. Radio Shack, Inc.*,
  2013 U.S. Dist. LEXIS 7868 (C.D. Cal. Jan. 17, 2013). . . . . . . . . . . . . . . . . . 15

*Phelps v. 3PD, Inc.*,
  261 F.R.D. 548 (D. Or. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Rodriguez v. West Publishing Corp.*,
  563 F.3d 948 (9th Cir. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Staton v. Boeing Co.*,
  327 F.3d 938 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12, 15, 22

*Stuart v. RadioShack Corp.*,
  2010 U.S. Dist. LEXIS 92067 (N.D. Cal. Aug. 9, 2010). . . . . . . . . . . . . . . . . . 7

*In re Tableware Antitrust Litigation*,
  484 F. Supp. 2d 1078 (N.D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Vitamins Antitrust Litigation*,
      2001 WL 856292 (D.D.C. July 25, 2001).. . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Thompson v. Clear Channel Communs., Inc. (In re Live Concert Antitrust Litigation)*,
      247 F.R.D. 98 (C.D. Cal. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Torrisi v. Tucson Electric Power Co.*,
      8 F.3d 1370 (9th Cir. 1993). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Wal-Mart Stores, Inc. v. Dukes*,
      131 S. Ct. 2541 (2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

**STATE CASES**

*Brinker Restaurant Corp. v. Superior Court*,
      53 Cal. 4th 1004 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 19

*Faulkinbury v. Boyd & Associates, Inc.*,
      216 Cal. App. 4th 220 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Manderville v. PCG&S Group, Inc.*,
      146 Cal. App. 4th 1486 (2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

**FEDERAL RULES**

Fed. R. Civ. P. 23(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 15, 22, 23
Fed. R. Civ. P. 23(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 23
Fed. R. Civ. P. 23(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 23
Fed. R. Civ. P. 23(h). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

**STATE STATUTES AND WAGE ORDERS**

Cal. Bus. & Prof. Code § 17200, *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . 2, 22
Cal. Labor Code § 510, 1999 Amendment Notes § 2(g). . . . . . . . . . . . . . . . . 10

Cal. Labor Code § 511(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Cal. Labor Code § 1174(d). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

Cal. Labor Code § 2699(e)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

IWC Wage Order 9-2001 §3(C)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

IWC Wage Order 9-2001 §5(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IWC Wage Order 9-2001 §7. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

IWC Wage Order 9-2001 §11(A). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

IWC Wage Order 9-2011 §11(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

IWC Wage Order 9-2001 §12. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

## TREATISES

Newberg on Class Actions §8.17 (5th ed. 2013). . . . . . . . . . . . . . . . . . . . . . . . . 24

## MEMORANDUM OF POINTS AND AUTHORITIES

### I. INTRODUCTION

By this motion, plaintiffs seek preliminary approval of a proposed class action settlement ("Settlement") with defendant Schneider, as well as provisional certification of the settlement class. Subject to Court approval, the parties have agreed to settle this wage-and-hour class action for $4.7 million. The Settlement was the result of lengthy and informed negotiations, and the settlement amount was proposed by the mediator. The Settlement accords substantial benefits to the 568 class members, who earn about $15-$16/hr on average. Teukolsky Decl. ¶77. The Settlement also includes several non-monetary terms that will improve the working conditions of class members. Accordingly, plaintiffs respectfully request that the Court grant preliminary approval of the settlement, provisionally certify the class, approve the class notice, and set a schedule for final approval proceedings. A proposed order is filed herewith.

### II. FACTUAL BACKGROUND

**A.    Summary of the Lawsuit**

In 2006, Schneider began operating a warehouse facility in Eastvale, CA on behalf of Walmart. On March 15, 2012, after more than a year of investigation, plaintiffs filed a complaint against Schneider alleging a number of wage-and-hour violations. Teukolsky Decl. ¶44. The First Amended Complaint ("FAC"), Doc. #29, which is the operative pleading, alleges that Schneider held an invalid election for an alternative workweek schedule ("AWS") in June 2008 because it failed to comply with the strict rules that govern AWS elections, and that Schneider made fraudulent misrepresentations to induce employees to vote for the AWS. Schneider also allegedly failed to implement the AWS schedule properly by failing to provide employees with a regular schedule. The FAC further alleges that Schneider failed to maintain proper records, failed to provide lawful breaks, unlawfully deducted (through an "auto-deduct" system) 30 minutes for meal breaks on shifts greater than

12 hours, and failed to pay proper reporting time pay.  The FAC alleges fourteen California law claims for: (1) unpaid overtime; (2) breach of contract; (3) unlawful rest breaks; (4) unlawful meal breaks; (5) unpaid reporting time pay; (6) unpaid wages; (7) failure to maintain accurate records; (8) failure to provide accurate wage statements; (9) waiting time penalties; (10) paying secret wages; (11) fraudulent misrepresentation; (12) Private Attorneys General Act ("PAGA") penalties; (13) violation Bus. & Prof. Code § 17200, *et seq.;* and (14) declaratory relief.

## B.    Motion Practice and Discovery

This action has been contested from the outset.  In February 2013, after several months of discovery, plaintiffs filed a motion for relief under Rule 23 on the basis that Schneider had improperly obtained declarations from class members.  Doc. #37. Schneider opposed the motion, contending that it properly met with and obtained declarations from these class members, and submitting evidence to this effect.  Doc. #39.  On March 25, 2013, the Court granted plaintiffs' motion, and entered an order that limited Schneider's communication with putative class members about the lawsuit, provided that the Court would disregard the 106 declarations, and authorized a curative class notice.  Doc. #61.

Schneider then noticed the depositions of six putative class members, which proceeded at an Ontario hotel in June 2013.  Teukolsky Decl. ¶46. Plaintiffs took four Rule 30(b)(6) depositions of Schneider's corporate representatives.  *Id*. ¶47. Meanwhile, Schneider deposed three named plaintiffs.  *Id*. ¶48. Schneider then told plaintiffs that it wished to take 90 additional class member depositions. The parties' negotiations about these 90 depositions were ongoing when the case settled, and plaintiffs' counsel anticipated motion practice to resolve the issue.  *Id*. ¶49.

The parties exchanged considerable written discovery.  Plaintiffs served over 125 document requests.  *Id*. ¶50.  Schneider produced over 189,000 documents and electronic files, including time and payroll records for all class members, employee

1    handbooks, meal period and overtime premium waiver forms signed by class

2    members, and AWS-related documents.  Plaintiffs' counsel spent hundreds of hours

3    reviewing these documents and meeting and conferring with Schneider's counsel

4    about emails that appeared to be missing and other discovery issues.  *Id*. ¶¶50-51.

5        For its part, Schneider propounded over 130 document requests to each of the

6    four named plaintiffs.  Plaintiffs produced 765 documents to Schneider.  *Id*. ¶52.

7    Schneider propounded 25 interrogatories to each of the named plaintiffs, and they

8    spent hours preparing detailed responses.  *Id*. ¶53; Downing Decl. ¶13; Gutierrez

9    Decl. ¶14; Ramirez Decl. ¶15; Quezada Decl. ¶15.

10       Independent of formal discovery, plaintiffs conducted extensive investigation

11   of their claims.  Plaintiffs' counsel interviewed more than 40 class members, and

12   held more than a dozen class member meetings to develop the facts of this case.

13   Teukolsky Decl. ¶54.  When the case settled, plaintiffs were preparing their motion

14   for class certification, which was due on September 23, 2013.  Doc. #20.

15   **C.    The Parties Engaged in Extensive Mediation and Settlement Efforts**

16       The parties engaged in extensive, arm's-length mediation efforts with Steve

17   Pearl, an experienced mediator, before settling on August 15, 2013.  Teukolsky Decl.

18   ¶55 & Exh. 31.  The parties attended a full-day mediation with Mr. Pearl on June 25,

19   2013.  *Id.* ¶56.  Before the mediation, both parties retained experts to help them

20   assess the case.  *Id*. ¶57.  Plaintiffs' expert built a database using the extensive time

21   and pay records that Schneider provided, and calculated damages and penalties for

22   each claim.  Plaintiffs' expert also analyzed the time records to determine, *inter alia*,

23   the extent to which Schneider had altered them, whether employees worked regular

24   schedules, and whether employees took 30-minute meal breaks.  *Id*.

25       The parties made substantial progress at mediation, but were unable to reach

26   agreement.  *Id*.  The parties continued to work with Mr. Pearl in a series of

27   telephonic conferences.  *Id*.  Mr. Pearl eventually made a mediator's proposal at $4.7

28

million, which both sides accepted.  *Id*. ¶59.  On August 15, 2013, the parties memorialized the essential settlement terms in a Memorandum of Understanding.  *Id*. The parties then spent more than 12 weeks drafting a detailed settlement agreement, which was fully executed on Nov. 11, 2013.  *Id*.

### III.  SUMMARY OF THE SETTLEMENT

**A.      The Class Settlement Fund**

Schneider has agreed to pay $4.7 million to settle plaintiffs' claims, which includes payments to class members, payment to the Labor Workforce Development Agency ("LWDA") for PAGA penalties, service awards to the named plaintiffs, attorneys' fees and costs, and the costs of claims administration.  Settlement ¶17.[1] Schneider will pay the employer's share of payroll taxes.  *Id*. ¶21.

Eligible claimants include all current and former hourly employees who have worked for Schneider at its Eastvale facility from March 15, 2008 through the date of preliminary approval, and who were subject to an AWS at any time during the covered period.  *Id*. ¶12, 16.  There are approximately 568 eligible class members. Teukolsky Decl. ¶45.  They will share the net settlement fund on a *pro rata* basis according to the number of weeks they worked at Schneider during the covered period.  Settlement ¶25.  The Claims Administrator will mail notice and a claim form to each class member after preliminary approval. *Id*. ¶24(a).  The claim form will state the number of workweeks and the estimated amount that each class member will receive.  *Id*. ¶24(c).  Class members may contest the number of workweeks, and the Claims Administrator has the authority to resolve any disputes. *Id*. ¶24(e).

Class members will have 60 days to submit a claim form. *Id*. ¶24(a).  Class members who do not submit claims within 40 days will be sent a reminder postcard. *Id*. ¶24(b).  Late claims will be invalid unless the Claims Administrator, with

---

[1]All exhibits are attached to the Teukolsky Declaration, filed herewith.  The Settlement is Exhibit 1 to the Teukolsky Declaration.

1  counsel's agreement, determines that there is good cause to extend the deadline. *Id*.

2  ¶24(a).  Class members will also have 60 days to object or opt out. *Id*. ¶24(d).

3       The Claims Administrator will make payments to class members within five

4  business days after the Settlement's Effective Date, and provide an accounting to the

5  Court and the parties of all payments made. *Id*. ¶30.  (If no objections are filed, the

6  Effective Date is the date of final approval.  If objections are filed and overruled, and

7  there is no appeal, the Effective Date is 30 days after final approval.  If there is an

8  appeal, the Effective Date is 30 days after the appeal is withdrawn or after an

9  appellate decision affirming final approval becomes final. *Id*. ¶13.)

10       The settlement fund is non-reversionary. *Id*. ¶17.  The amounts of any

11  uncashed settlement checks after ninety days will be paid *cy pres* to the Inland

12  Empire United Way. *Id*. ¶26.  The LWDA will be paid $5,000 for PAGA penalties.

13  *Id*. ¶27.  By separate motion, which plaintiffs will file before the fairness hearing,

14  plaintiffs' counsel will apply for $1.56 million in attorneys' fees (1/3 of the

15  settlement amount), plus costs, currently estimated at approximately $48,000. *Id*.

16  ¶29; Teukolsky Decl. ¶60.  Schneider will not oppose plaintiffs' motion for fees and

17  costs.  Settlement ¶29.  The named plaintiffs will seek $10,000 each for a service fee

18  award, in addition to their shares as class members. *Id*. ¶28.

19  **C.  The Non-Monetary Settlement Terms**

20       Schneider has agreed to several non-monetary terms to address certain alleged

21  unlawful policies and practices in the warehouses.  First, the parties have agreed to

22  the entry of an injunction to terminate the AWS, effective no later than February 1,

23  2014.  Employees will then revert to a "normal" schedule of five 8-hour workdays

24  per week. *Id*. ¶31(a).  Second, Schneider will implement a new policy to ensure that

25  all time records edits are authorized by employees. *Id*. ¶31(c). Schneider will

26  self-audit and provide training to ensure compliance, and will also provide plaintiffs'

27  counsel with a periodic report showing all changes made to employee time records.

28  *Id*.

Third, to address allegations that Schneider improperly asked employees to sign waivers of their right to overtime pay, Schneider has agreed that it will not use any such waivers in the future. *Id*. ¶31(d).  Fourth, to address concerns that managers exercise favoritism in deciding who will receive work when there is low volume, Schneider will begin using a mechanism by which its hourly employees will be selected for a reduction in hours on a rotating basis, using pre-determined and objective criteria. *Id*. ¶31(e) & Attachment 1.

Fifth, during the lawsuit, Schneider revised its meal and rest period policies to comply with the law.  Teukolsky Decl. ¶63.  The Settlement memorializes Schneider's  agreement to continue complying with its new policies.  Settlement ¶31(f).  Sixth, Schneider will revise its reporting time policies so that employees are informed that if they "volunteer" to leave early before performing half of their usual or scheduled day's work, they will not receive reporting time pay, and that they may refuse to leave early unless Schneider pays them reporting time pay. *Id*. ¶31(g).

**D.    Limited Publicity of the Parties' Settlement**

The Settlement provides for limited publicity of the Settlement, although this clause does not otherwise limit plaintiffs' ability to communicate with class members about the case or the Settlement.  Settlement ¶34.

## IV.  LEGAL ANALYSIS

**A.    Standards Governing Preliminary Approval of a Class Settlement**

The Ninth Circuit has articulated a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *Class Plaintiffs v. Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992) (citations omitted).  The Court's review of a class action settlement, required by Fed. R. Civ. P. 23(e), is a two-step process. *Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 525 (C.D. Cal. 2004).  First, the Court must determine whether to grant preliminary approval and order class notice. *Id*.  The Court must also determine whether to

provisionally certify the class.  *Lamb v. Bitech, Inc.*, 2013 U.S. Dist. LEXIS 109875, *9 (N.D. Cal. Aug. 5, 2013) (citation omitted).

Second, the Court must hold a final fairness hearing to determine if the settlement is "fair, reasonable, and adequate."  Fed. R. Civ. P. 23(e)(2).  While the Court will consider multiple factors at the fairness hearing, *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), at the preliminary stage a settlement is presumptively fair if it "appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval."  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007) (quoting Manual for Complex Litigation, Second §30.44 (1985)); *accord Monterrubio v. Best Buy Stores, L.P.*, 2013 U.S. Dist. LEXIS 68647, *28 (E.D. Cal. May 13, 2013).

**B.      The Court Should Grant Preliminary Approval to the Settlement**

**1.      The Settlement Is Well "Within the Range of Possible Approval"**

To determine whether the settlement is within the range of possible approval, "courts primarily consider plaintiffs' expected recovery balanced against the value of the settlement offer."  *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d at 1080 (citation omitted).  Here, our expert's analysis showed that, if plaintiffs were 100% successful on *all* claims, they would be entitled to slightly more than $5 million in damages (not including interest).  Teukolsky Decl. ¶¶64-65.  Plaintiffs potentially could have recovered an additional $3.9 million in penalties.  *Id*. ¶66.

Plaintiffs discounted the PAGA penalties because the Court has significant discretion to decide the amount of the penalties and whether to award them at all. *Stuart v. RadioShack Corp.*, 2010 U.S. Dist. LEXIS 92067, *9-10 (N.D. Cal. Aug. 9, 2010) (citing Cal. Lab. Code § 2699(e)(2)).  Plaintiffs also applied various discounts to account for the risk and expense of further litigation.  Teukolsky Decl. ¶67. Schneider is represented by extremely able and experienced defense counsel with

abundant resources.  Plaintiffs have already incurred more than $1.4 million in fees and spent more than $48,000 in costs – numbers which would have risen quickly had the Court permitted Schneider to take 90 additional class member depositions.  *Id*. ¶60.   By settling now, plaintiffs have avoided the expense of a motion for class certification, a motion for summary judgment, and a complex class action trial.

Plaintiffs also faced some risk in continuing litigation.  Schneider has vigorously contested both liability and the propriety of class certification.  With respect to the overtime claim, Schneider contended that it properly complied with all of the AWS election requirements.  *Id*. ¶68.  Specifically, Schneider contended that it held AWS informational meetings for all affected employees, Exh. 32 (SLTD-QUE 1749-1785),  and provided each of them with an "AWS Disclosure" that explained the effect of the AWS on their schedules.  Exh. 14 (Depo. Exh. 24).  Schneider contended that it provided the AWS Disclosure in both English and Spanish, Exh. 33 (Depo. Exh. 59); Exh. 7 (Pickens Depo.) at 232:13-17; Exh. 4 (Flaherty Depo.) at 119:2-6, and while the meetings were conducted in English, bilingual leaders were available to speak with Spanish-speaking employees after the meetings.  Exh. 7 (Pickens Depo.) at 228:7-9.  Schneider maintained that after the meetings, it mailed the AWS Disclosures to employees.  Exh. 34 (SLTD-QUE188754); Exh. 7 (Pickens Depo.) at 237:3-12.

Schneider further contended that the AWS election was held on June 24 and 26, 2008.  Exh. 35 (SLTD-QUE 1786-1843.)  All work units passed the AWS except for the three-person Merchandising unit.  Exh. 36 (SLTD-QUE110865.)  Schneider maintained that the election results were properly reported to the Department of Industrial Relations.  Exh. 14 (Depo Ex. 24.).  Alternatively, Schneider maintained that the AWS disclosure requirements were too vague to be enforced.  Schneider further contended that class certification of the overtime claim was inappropriate because whether employees received the disclosures is an individualized inquiry, as is the question of whether employees received "regularly recurring" schedules.

With respect to the fraudulent misrepresentation claim, Schneider contended that there was no evidence of misrepresentation regarding the implementation of the AWS.  Schneider maintained that it had to make some operational changes to deal with a decreased volume of work.  Exh. 7 (Pickens Depo.) at 143:25, 144:1-8.  Originally, this included the potential that associates would be laid off.  Exh. 4 (Flaherty Depo.) at 83:21-25, 84:1-16.  Schneider contended, however, that no associate was in fact terminated as a result of the transition to the AWS schedule.  Exh. 4 (Flaherty Depo.) at 83:21-25, 84:1-16.)  Schneider planned to argue that this claim could not be certified on a class basis, as the inquiry involves review of which employees were laid off; which employees were intended to be transferred to other, lower paying positions as alleged by plaintiffs; the individual reasons employees did not complete scheduled shifts; the nature of each individual employee's schedule; and whether each individual employee was somehow allegedly misled.  Teukolsky Decl. ¶68.

With respect to meal breaks, Schneider contended it provided all employees with the opportunity to take breaks, and that employees validly waived their breaks.  Schneider elicited testimony to this effect from some putative class members.  Schneider further contended that its written policies complied with California law, and intended to argue that the reason for missed breaks required an individualized inquiry that could not be resolved on a classwide basis.  Teukolsky Decl. ¶69.

With respect to the reporting time claim, Schneider contended that it properly paid reporting time pay because employees who reported to work on days that there was less than four hours of work were paid reporting time pay unless they volunteered to leave early, in which case they were paid only for the time that they worked.  Teukolsky Decl. ¶68; Exh. 5 (Gonzalez Depo.) at 142:11-19.  Schneider maintained that class certification of this claim was inappropriate because the Court would need to make an individual inquiry, involving a review of forms signed by employees, to determine whether an employee's early departure was voluntary or

company-driven.  Exh. 5 (Gonzalez Depo.) at 71:17-20; 72:4-15.  Importantly, Schneider maintained that employees routinely used "Voluntary Time Off" as personal time to leave the shift early.  Exh. 7 (Pickens Depo.) at 91:13-19; 116:9-15; Exh. 37 (SLTD-QUE 157127);  Exh. 38 (SLTD-QUE157132-134).

Finally, with respect to the record-keeping claim, Schneider maintained that it properly recorded all time worked by its employees, and absent review of each "Time and Attendance Adjustment" form signed by employees and individual circumstances, certification would not be appropriate.  Teukolsky Decl. ¶68.

In light of these potential obstacles, and given the cost and delay that would result from litigating these issues and proceeding to trial, the benefits of the proposed settlement are substantial.  The settlement fund of $4,700,000 will provide meaningful relief for class members.  Class members will share about $3,032,500, assuming that the Court approves the requested attorneys' fees and service awards. Exh. 2 at 2.  If all 568 class members make claims (which is unlikely), each would receive an average of about $5,339.  For employees who earn an average $15-$16/hour, Teukolsky Decl. ¶77, this amount is significant.  Moreover, class members will receive this amount *now*, instead of having to wait years for this case to proceed through trial and appeal.  Finally, the mediator himself proposed the settlement amount, further evidence that it is well "within the range of possible approval."

The non-monetary aspects of the Settlement substantially improve working conditions in the warehouses.  After the termination of the AWS, class members will be paid overtime for all hours worked in excess of 8 hours (as opposed to 10 hours), which is the favored public policy in California.  Cal. Lab. Code § 510, 1999 Amendment Notes § 2(g) ("[T]he Legislature affirms the importance of the eight-hour workday, declares that it should be protected, and reaffirms the state's unwavering commitment to upholding the eight-hour workday as a fundamental protection for working people.").  Schneider has agreed to stop using forms on which employees purport to waive their right to overtime premiums; to continue to abide by

the lawful meal and rest break policies implemented after this lawsuit was filed; to implement a new policy to ensure that all changes to employee time records are authorized; to use a fair and transparent system for reducing hours when there is little work in the warehouses; and to ensure that employees do not unknowingly waive their right to reporting time pay.  It is doubtful that plaintiffs could have obtained much more in the way of injunctive relief had this case been litigated through to trial. For these reasons, the Settlement is well "within the range of possible approval."

### 2.     The Settlement Resulted From Extensive, Informed Negotiations

The Settlement is presumptively fair because it resulted from lengthy and informed negotiations.  Plaintiffs performed substantial pre-filing investigation. Both parties engaged in extensive discovery and retained experts to help them analyze voluminous time and pay data for all class members.  *See* Sec. II.C, *supra*. Thus, both parties had sufficient information to make informed decisions about settlement value.  *Monterrubio*, 2013 U.S. Dist. LEXIS 68647, at *29 ("[A]pproval . . . is proper as long as discovery allowed the parties to form a clear view of the strengths and weaknesses of their cases.").

The negotiations were also hard-fought.  The parties were unable to settle on the first day of mediation, which lasted more than ten hours. The parties were able to reach agreement only after several weeks of continued negotiations, which took place over the course of seven weeks, and included three separate telephonic conferences between the parties mediated by Mr. Pearl, each of which lasted several hours.  Teukolsky Decl. ¶¶56, 58.  The parties entered into a MOU on August 15, 2013, and then spent almost three months drafting the final settlement agreement. *Id*. ¶59.  Because the Settlement is the product of non-collusive and informed negotiations, the Court should presume that it is fair.

### 3.     The Settlement has no Obvious Deficiencies

A variety of "obvious deficiencies" can preclude preliminary approval, including "unduly preferential treatment of class representatives or of segments of

1   the class, or excessive compensation for attorneys." *In re Vitamins Antitrust Litig.*,

2   2001 WL 856292, at *4 (D.D.C. July 25, 2001) (citing Manual for Complex

3   Litigation Third §30.41 (1995)).  Courts have also denied approval because of

4   unduly broad releases.  *Custom LED, LLC v. eBay, Inc.*, 2013 U.S. Dist. LEXIS

5   122022, *18-19 (N.D. Cal. Aug. 27, 2013).  None of these defects is present here.

###           a.       The Service Awards to the Named Plaintiffs are Reasonable

7          Service awards to named plaintiffs "are intended to compensate class

8   representatives for work done on behalf of the class, to make up for financial or

9   reputational risk undertaken in bringing the action, and, sometimes, to recognize

10  their willingness to act as a private attorney general."  *Rodriguez v. West Publishing

11  Corp.*, 563 F.3d 948, 958-59 (9th Cir. 2009).  Here, plaintiffs seek a $10,000 service

12  award for each of the four named plaintiffs, for a total of $40,000, which represents

13  less than 1% of the settlement fund.  *Staton v. Boeing*, 327 F.3d 938, 977 (9th Cir.

14  2003) (courts should evaluate service awards by considering "the number of named

15  plaintiffs receiving incentive payments, the proportion of the payments relative to the

16  settlement amount, and the size of each payment.").

17         The proposed service awards are appropriate given the time and effort that

18  plaintiffs dedicated to this case.  Three of the named plaintiffs are current employees

19  who risked retaliation and experienced ostracization in the workplace for bringing

20  this lawsuit.  Quezada Decl. ¶14; Gutierrez Decl. ¶13; Ramirez Decl. ¶14.  Three

21  named plaintiffs underwent depositions, using their days off work to prepare.  All of

22  them spent countless hours responding to Schneider's written discovery, including,

23  for example, 165 document requests directed to named plaintiff Victor Ramirez

24  alone.  Ramirez Decl. ¶¶15-16; Quezada Decl. ¶¶15-16; Gutierrez Decl. ¶14;

25  Downing Decl. ¶¶13-14.  The named plaintiffs have provided invaluable advice and

26  guidance to plaintiffs' counsel at every step of this litigation, including with respect

27  to all essential settlement terms.  In short, a $10,000 service award is reasonable.

28  *Espinoza v. Domino's Pizza, LLC*, 2012 U.S. Dist. LEXIS 160641, *10 (C.D. Cal.

1  Nov. 7, 2012) ($10,000 service awards were reasonable); *Ingalls v. Hallmark Retail,*

2  *Inc.*, 2009 U.S. Dist. LEXIS 131078, *6 (C.D. Cal. Oct. 16, 2009) (same).

### b.  The Requested Attorneys' Fees are Reasonable

4  Before the fairness hearing, plaintiffs' counsel will file a motion under Fed. R.

5  Civ. P. 23(h) seeking attorneys' fees in the amount of $1.56 million to compensate

6  them for the time they have spent litigating this case, plus costs.  This amount

7  represents one-third of the settlement fund, and is slightly higher than plaintiffs'

8  current lodestar amount of approximately $1.48 million, although plaintiffs' lodestar

9  will undoubtedly exceed $1.56 million by final approval.  Teukolsky Decl. ¶¶60-61.

10  Because this case arises under California law, the Court applies California law

11  to calculate the attorneys' fees.  *Mangold v. California Pub. Utils. Comm'n*, 67 F.3d

12  1470, 1478 (9th Cir. 1995).  "[A] review of California cases in other districts reveals

13  that courts usually award attorneys' fees in the 30-40% range in wage and hour class

14  actions that result in recovery of a common fun[d] under $10 million."  *Cicero v.*

15  *DirecTV, Inc.*, 2010 U.S. Dist. LEXIS 86920, *17-18 (C.D. Cal. July 27, 2010)

16  (citing numerous such cases); *see also Barbosa v. Cargill Meat Solutions Corp.*,

17  2013 U.S. Dist. LEXIS 93194 (E.D. Cal. July 2, 2013) (awarding 1/3 of the

18  settlement fund to class counsel 1.5 years after case was filed and before class

19  certification where the majority of class members were Spanish-speaking).

20  The fees that plaintiffs' counsel will seek are reasonable given the amount of

21  time that counsel spent on this case, the case's complexity, and the excellent results –

22  both monetary and non-monetary – that they achieved in settling this case before

23  class certification.  Plaintiffs' counsel has spent thousands of hours researching and

24  litigating this case for more than two years, without any guarantee of a recovery.

25  They have conducted extensive investigation, interviewed dozens of class members,

26  held more than a dozen class meetings, negotiated with Schneider's counsel

27  regarding multiple discovery disputes, and reviewed thousands of pages of

28  documents.  Communicating with the named plaintiffs and class members has been

particularly time-consuming since the majority speak Spanish.  Teukolsky Decl. ¶¶53-54.

Plaintiffs' counsel also deposed four corporate representatives, defended three named plaintiff depositions, and successfully engaged in game-changing motion practice, described in Section II.B, *supra*.  Further, before the mediation, plaintiffs' counsel worked closely with an expert to develop a damages model using Schneider's payroll data and time records, and was able to persuade Schneider to pay close to full value of the projected damages (not including interest or penalties) prior to a motion for class certification.  Teukolsky Decl. ¶¶57, 64, 72-73.  As a result of this litigation, Schneider has already changed many of its unlawful policies and practices, and has agreed to other significant changes that will improve the working conditions of class members.  The requested fees will fairly and reasonably compensate plaintiffs' counsel for their successful vindication of class members' rights, taking into account the quality, nature and extent of counsel's efforts, the favorable results achieved, the benefits to the class, and the substantial number of future hours that plaintiffs' counsel anticipate will be required to implement and enforce the Settlement.  Teukolsky Decl. ¶61.

> ### c.    The Release is Narrowly Tailored to the Class Claims

The scope of the release is appropriately narrow because it releases only those claims that were asserted or could have been asserted based on the facts alleged in the FAC.  *Cf. Custom LED*, 2013 U.S. Dist. LEXIS 122022, at *18-19 (settlement improperly released unrelated claims of class members against the defendant).

## C.    The Court Should Provisionally Certify the Settlement Class

For purposes of settlement, plaintiffs seek provisional certification of the following class:  "All current and former hourly employees who have worked for Schneider at its Mira Loma/Eastvale facility during the Class Period, March 15, 2008 until Preliminary Approval, and who have been subject to an alternative workweek schedule at any time during the Class Period."  Settlement ¶16.  A class action may

be certified if "the proposed settlement class satisfies the requirements of Rule 23(a) of the Federal Rules of Civil Procedure applicable to all class actions, namely: (1) numerosity, (2) commonality, (3) typicality, and (4) adequacy of representation." *Hanlon*, 150 F.3d at 1019.  The class must also meet at least one of the subsections of Rule 23(b).  *Lamb*, 2013 U.S. Dist. LEXIS 109875, at *9 (citation omitted).  "When, as here, the parties have entered into a settlement agreement before the district court certifies the class, reviewing courts 'must pay undiluted, even heightened, attention to class certification requirements." *Staton*, 327 F.3d at 952 (9th Cir. 2003) (citation and internal quotation marks omitted).  Plaintiffs easily meet the requirements for class certification.

### 1.    The Proposed Class is Sufficiently Numerous

Rule 23(a)(1) requires that the class be so numerous that joinder of all class members would be "impracticable." Fed. R. Civ. P. 23(a)(1).  The numerosity requirement is generally met when the class exceeds forty members. *Jordan v. Los Angeles County*, 669 F.2d 1311, 1319 (9th Cir. 1982).  Here, Schneider's records show that there are approximately 568 individuals in the settlement class.  Teukolsky Decl. ¶45.  Accordingly, the proposed class satisfies the numerosity requirement.

### 2.    Common Issues of Law and Fact Predominate

Rule 23(a)(2) requires the presence of questions of law and fact common to the class.  Under Rule 23(b)(3), common questions must "predominate over any questions affecting only individual members." *Ordonez v. Radio Shack, Inc.*, 2013 U.S. Dist. LEXIS 7868, *17 (C.D. Cal. Jan. 17, 2013) (quoting Fed. R. Civ. P. 23(b)(3)).  "Commonality requires the plaintiff to demonstrate that the class members have suffered the same injury . . . [and] [t]heir claims must depend upon a common contention . . . of such nature that it is capable of classwide resolution – which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2551 (2011) (internal quotation marks and citations

1    omitted).  In this case, there are a number of common questions that satisfy the

2    *Dukes* commonality criteria.

3                          **a.    The Overtime Claim - AWS**

4          First, the Court should certify the overtime claim because there is a common,

5    predominant question whether Schneider held an invalid AWS election in June 2008

6    by failing to comply with the strict requirements that govern AWS elections.  IWC

7    Wage Order 9-2001 §3(C) (failure to comply with disclosure requirements ***"shall***

8    ***make the election null and void"***) (emphasis added).  This common question may be

9    resolved for all class members "in one stroke" – either the election was valid, or it

10   was not.  *Cf. Polanco v. Schneider National Carriers, Inc.*, Case No. CV 20-4565-

11   GHK (JEMx), order dated October 25, 2012 (attached as Exh. 2) (certifying overtime

12   claim premised on the contention that an AWS election was invalid).

13         Here, the AWS election was invalid because Schneider failed to provide the

14   legally-required disclosures to its employees and failed to provide disclosures in

15   Spanish even though more than 5% of the workforce spoke Spanish at the time of the

16   election.  Exh. 6 (Kozik Depo.) at 120:9-22, 137:3-138:1, 139:7-140:5; Exh. 9

17   (Depo. Exh. 7), Exh. 10 (Depo. Exh. 9) at 8.  Schneider admits that it held the

18   disclosure meetings only in English.  Exh. 7 (Pickens Depo.) at 227:12-22; Exh. 4

19   (Flaherty Depo.) at 119:7-12, 120:19-25.  Moreover, several class members never

20   received *any* written disclosures, in either English or Spanish.  Exh. 27 (Holguin

21   Depo.) at 91; Exh. 28 (Hernandez Depo.) at 35:23-24; Exh. 29 (Flores Depo.) at

22   124:13-125:6; Exh. 30 (Elizalde Depo.) at 65:20-25; Gutierrez Decl. ¶3; Quezada

23   Decl. ¶¶3-4; Downing Decl. ¶3; Ramirez Decl. ¶¶3-4.[2]  Thus, the overtime claim may

24   be decided "in one stroke" and is appropriate for class treatment.

25

26         [2]Plaintiffs' alternative theory is that Schneider failed to provide "a regularly
     scheduled alternative workweek in which the specified number of work days and
27   work hours are regularly recurring."  Wage Order 9-2001 § 3(C)(1); Cal Labor Code
     § 511(a).  Instead, Schneider created a system of "on call" employment in which "the
28   days and hours of work are subject to continual changes, depriving employees of a
     predictable schedule."  Simmons Wage and Hour Manual for California Employers §
     9.7 (14th ed.) (citing IWC Statement as to the Basis).  *See* Teukolsky Decl. ¶72.

### b.    The Fraudulent Misrepresentation Claim

Second, the Court should certify the fraudulent misrepresentation claim because there is a common question whether Schneider knowingly made false representations to induce its employees to vote for the AWS. *Manderville v. PCG&S Group, Inc.*, 146 Cal. App. 4th 1486, 1498 (2007).  Specifically, during the AWS meetings, Schneider told employees: (1) that it did not intend to eliminate anyone's position (Exh. 15 (Depo. Exh. 53) at 2; Exh. 4 (Flaherty Depo.) at 78:12-79:11); (2) that employee compensation would be unaffected (Exh. 14 (Depo. Exh. 24) at 2); (3) that employees would be paid overtime for "short shifts," i.e., shifts of more than 8 hours on days that Schneider was unable to provide 10 hours of work (Exh. 14 (Depo. Exh. 24) at 2); and (4) that employees would receive a "regularly recurring" schedule of four 10-hour workdays per week (Exh. 14 (Depo. Exh. 24) at 5).

These statements were false because: (1) Schneider's internal plan showed that it intended to terminate 31 employees after they voted to adopt the AWS (Exh. 16 (Depo. Exh. 54) at 3) (2) Schneider intended to transfer a number of employees to different positions and pay them at lower rates (Exh. 7 (Pickens Depo.) at 191-193, 195-199; Exhs. 19-21 (Depo. Exhs. 106-108); Exh. 23 (SLTD-QUE 185955-185956)), and Schneider predicted it would pay employees $650,000 less in overtime annually (Exh. 10 (Depo. Exh. 9) at 3); (3) Schneider required employees to waive overtime pay when they worked "short shifts" (Exh. 5 (Gonzalez Depo.) at 60:14-73:19, 75:2-78:11); and (4) Schneider had no intention to provide employees with a "regularly recurring" schedule, but instead provided employees with an erratic and constantly-changing schedule (Teukolsky Decl. ¶72; Ramirez Decl. ¶5; Downing Decl. ¶4; Gutierrez Decl. ¶4; Quezada Decl. ¶5).

Because the fraud claim stems from a "'common course of conduct,'" and involves identical misrepresentations made to all employees at the same time, it is appropriate for class certification. *Phelps v. 3PD, Inc.*, 261 F.R.D. 548, 560-61 (D. Or. 2009) (quoting *In re First Alliance Mtg. Co.*, 471 F.3d 977, 990 (9th Cir. 2006)).

### c.      The Rest Break Claim

Third, the Court should certify the rest break claim because there is a common question whether Schneider failed to provide employees with a second rest break for shifts lasting between six and eight hours.  After the AWS went into effect, Schneider set a rigid break schedule that incorrectly presupposed all employees were actually working 10-hour shifts.  Employees had a scheduled start time of 5:00am and a scheduled end time of 3:30pm.  Quezada Decl. ¶6; Downing Decl. ¶5; Ramirez Decl. ¶6; Gutierrez Decl. ¶5.  Employees were told that they were only permitted to take their second rest break at 1:15pm, which is when supervisors called it over the PA system.  *Id*.; Exh. 18 (Depo. Exh. 84); Exh. 6 (Kozik Depo.) at 197:6-23.  However, because Schneider provided employees with erratic schedules, approximately 18% of shifts did not last until 3:30pm, and lasted only between six and eight hours.  Teukolsky Decl. ¶73.  For these shifts, which ended between 11:30am and 1:30pm, employees either did not receive a second rest break at all, or received the break at the very end of the 8-hour shift.  Quezada Decl. ¶6; Downing Decl. ¶5; Ramirez Decl. ¶6; Gutierrez Decl. ¶5.

Schneider's written policy contributed to this unlawful practice, providing simply: "You will be given a 15 minute break for each four-hour period of work scheduled."  Exh. 11 (Depo. Exh. 10) at 4.  In violation of Wage Order 9-2001 §12, the policy failed to inform employees that they could take breaks every four hours "*or major fraction thereof*," and that they should take their breaks in the middle of their shift, insofar as practicable.  Schneider did not change its unlawful policy and practices until October 2012, after plaintiffs filed suit.  Exh. 12 (Depo. Exh. 16); Exh. 6 (Kozik Depo.) at 216:17-217:12.  This unlawful rest break policy applied uniformly to all class members.  Exh. 6 (Kozik Depo.) at 13:3-16, 25:4-18.

If an employer adopts a uniform policy that does not authorize rest breaks in accordance with the timing mandated by the wage orders, then "it has violated the wage order and is liable."  *Brinker Restaurant Corp. v. Superior Court*, 53 Cal. 4th

1004, 1033 (2012); *see also Faulkinbury v. Boyd & Associates, Inc.*, 216 Cal. App. 4th 220, 236-37 (2013) (certifying rest break class).  Class certification is appropriate where an employer has a uniform policy that fails to provide a second rest break to employees working shifts lasting between 6-8 hours.  *Brinker*, 53 Cal. 4th at 1033.  Because Schneider consistently enforced its unlawful rest break policy against all class members, plaintiffs' rest break claim is suitable for class treatment.

### d.  The Meal Break Claim

Fourth, the Court should certify the meal break claim because Schneider had a number of uniform, classwide policies and practices that violated its employees' rights to take meal breaks.  Schneider's written policies were facially unlawful under Wage Order 9-2001 §11(A) because they failed to inform employees that they were permitted to take a meal break *for every five hours worked*, Exh. 11 (Depo. Exh. 10 at) 4; Exh. 6 (Kozik Depo.) at 171:15-172:3, 175:8-23, 179:25-181:7), and required employees to choose between a paid 15-minute rest break and an unpaid 30-minute meal period.  Exh. 11 (Depo Exh. 10) at 1.

Schneider's meal practices were also unlawful.  Even though Schneider had no written policy regarding meal waivers, Exh. 6 (Kozik Depo.) at 52:25-54:22, it routinely required all employees to waive their meal periods.  In July 2008, Schneider required all employees to sign a blanket meal waiver purporting to waive every single second meal period for every shift *in the future* lasting between ten and twelve hours.  Exh. 8 (Depo. Exh. 5); Exh. 24 (SLTD-QUE 186322); Gutierrez Decl. ¶6; Quezada Decl. ¶7; Downing Decl. ¶6; Ramirez Decl. ¶7.  Our expert's analysis shows that *for more than 99% of shifts lasting between 10 and 12 hours, employees did not take a second meal break*.  Teukolsky Decl. ¶73.  Whether an employer has a uniform practice of requiring employees to sign a blanket meal period waiver is a common question appropriate for class certification.  *Faulkinbury*, 216 Cal. App. 4th 220, 233-34 (2013); *Escano v. Kindred Healthcare Operating Co.*, 2013 U.S. Dist. LEXIS 29899, *30-31 (C.D. Cal. Mar. 5, 2013) ("The court finds that the apparently

universal signing of the second meal waiver lends itself to the inference that signing the waiver is a condition of employment and gives rise to a class question").

For shifts lasting 5 to 6 hours, Schneider did not provide a first meal break. Class members were simply told by supervisors that they were not entitled to meal breaks for these shifts. Gutierrez Decl. ¶7; Quezada Decl. ¶8; Downing Decl. ¶7. Before November 2011, Schneider had no records documenting any waivers of first meal breaks. Exh. 6 (Kozik Depo.) at 68:9-69:17; Teukolsky Decl. ¶74 & Exh. 26.

Schneider also failed to provide second meal breaks for shifts lasting more than 12 hours. Employees may not waive a second meal break after 12 hours of work. Wage Order 9-2011 §11(B). Yet a review of the time records shows that, for shifts lasting more than 12 hours, almost 85% of employees did not take a second 30-minute meal period. Teukolsky Decl. ¶73. Compounding this illegal practice, in 2008, Schneider programmed its system to deduct 30 minutes from employees' time records for shifts lasting more than 12 hours as an "automatic" meal break deduction, even though most employees did not take the break. Exhs. 13 & 17 (Depo. Exhs. 22 & 67); Exh. 5 (Gonzalez Depo.) at 49:21-51:9. This "auto-deduct" practice lasted until approximately October 2010, when an employee complained and Schneider apparently discontinued the practice. Exh. 13 (Depo. Exh. 22.) Employees were largely unaware that the practice was occurring. Quezada Decl. ¶10; Ramirez Decl. ¶9. All of the foregoing uniform, unlawful, classwide practices warrant certification of the meal break claim.

### e.   The Reporting Time Pay Claim

Fifth, the Court should certify the reporting time pay claim because there is a common question whether Schneider unlawfully caused employees to waive their right to reporting time pay. California law mandates that employers pay for "reporting time" when an employee "is not put to work or is furnished less than half said employee's usual or scheduled day's work." IWC Wage Order 9-2001 §5(A). Schneider admitted that, when there is low volume, it has a uniform, classwide

1   practice of asking employees to "volunteer" to leave before performing four hours of

2   work without paying "volunteers" reporting time pay.  Schneider did not disclose to

3   these employees that by agreeing to leave early, they were waiving their right to

4   reporting time pay under California law.  Exh. 5 (Gonzalez Depo.) at 142:11-145:4.

5   Schneider's written policy did not inform employees that Schneider must pay them

6   reporting time pay if it fails to provide half of their scheduled day's work, and that

7   they may refuse to leave early unless Schneider pays them reporting time pay.  Exh.

8   22 (SLTD-QUE 110854-56).  Schneider admits that it engaged in this practice, but

9   disputes that it is unlawful.  Thus, the issue is appropriate for class certification

10  because it may be resolved "in one stroke" on a classwide basis.

11                    **f.        The Inaccurate Record-Keeping Claim**

12          Sixth, the Court should certify a record-keeping claim because there is a

13  common question whether Schneider made unauthorized changes on a classwide

14  basis to employee time records in violation of California's record-keeping

15  requirements.  Cal. Labor Code §1174(d);  IWC Wage Order 9-2001 §7.  Schneider's

16  supervisors made extensive changes to employee time records without their

17  knowledge or authorization.  Exh. 27 (Holguin Depo.) at 122:14-126:7, 127:8-129:4,

18  129:19-133:3; Exh. 29 (Flores Depo.) at 171:3-177:20; Exh. 30 (Elizalde Depo.) at

19  104:18-109:1.  Our expert's analysis shows that, of the 216,281 shifts examined,

20  supervisors shaved employees' time for 12,873 such shifts, or 5.95% of shifts.

21  Teukolsky Decl. ¶75.  Supervisors also changed time records to add 4,316 meal

22  periods and to edit 4,299 meal periods to qualify as 30-minute breaks.  *Id.*

23  Schneider's Human Resources Director testified that it is a "major" violation of

24  company policy for supervisors to change an employee's time records without

25  supporting documentation.  Exh. 6 (Kozik Depo.) at 228-231, 236.  Yet Schneider

26  produced only about 3,000 employee authorization forms even though supervisors

27  made more than 20,000 changes to employee time records.  Teukolsky Decl. ¶76.

28  The record-keeping claim is therefore appropriate for class treatment.

### g. The Derivative Claims Should Also Be Certified

Plaintiffs' claims for penalties under the Private Attorneys General Act ("PAGA"), for waiting time penalties, for inaccurate wage statement penalties, and for violation of the Unfair Competition Law (Cal. Bus. & Prof. Code § 17200, *et seq.*, are derivative of the above claims, and should be certified as well.

### 3. The Claims of the Named Plaintiffs Are Typical

Typicality is satisfied when "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). Typicality is met when "[p]laintiffs' situations share a common issue of law or fact, and are sufficiently parallel to insure a vigorous and full presentation of all claims for relief." *Thompson v. Clear Channel Communs., Inc. (In re Live Concert Antitrust Litig.)*, 247 F.R.D. 98, 117 (C.D. Cal. 2007) (internal quotation marks and citation omitted). Here, the named plaintiffs' claims are typical of the proposed class. Each plaintiff was present for the invalid AWS election and during its improper implementation. Gutierrez Decl. ¶¶3-4; Quezada Decl. ¶¶3-4; Downing Decl. ¶¶3-4; Ramirez Decl. ¶¶3-5. The named plaintiffs were also subject to the other improper conduct alleged in the FAC, including not being provided lawful rest and meal breaks and not receiving proper reporting time pay. Gutierrez Decl. ¶¶5-8; Quezada Decl. ¶¶5-11; Downing Decl. ¶¶5-8; Ramirez Decl. ¶¶6-10. Thus, the typicality requirement is met.

### 4. The Class Representatives and Counsel Are Adequate

The adequacy of the representation requirement is met so long as class counsel and class representatives "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). "To determine whether the representation meets this standard, [a court] ask[s] two questions: (1) Do the representative plaintiffs and their counsel have any conflicts of interest with other class members, and (2) will the representative plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Staton*, 327 F.3d at 957. Here, there are no conflicts between the

named parties and the class they seek to represent.  Plaintiffs' counsel has extensive experience in wage-and-hour class actions and has vigorously investigated and litigated the class claims.  Teukolsky Decl. ¶¶3-43.  Thus, the adequacy requirement of Rule 23(a)(4) is satisfied.

### 5.    Class Certification is Proper Under Fed. R. Civ. P. 23(b)(3)

In addition to the prerequisites of Rule 23(a), the case must meet at least one of the Rule 23(b) requirements.  Here, the case is appropriate for certification under Rule 23(b)(3), which requires that common questions "predominate over any questions affecting only individual members," and that class resolution is "superior to other available methods for the fair and efficient resolution of the controversy." *Hanlon*, 150 F.3d at 1022 (quoting Fed. R. Civ. P. 23(b)(3)).

As shown above in Section IV.C.3, common questions predominate over any individual questions in this case, and all of the questions presented above may be decided "in one stroke" for all class members.  Class resolution is plainly superior to other methods for resolving this controversy.  Absent the class mechanism, hundreds of Schneider employees would have to file individual lawsuits, necessitating hundreds of different proceedings to resolve the same claims.  This would be inefficient and a waste of judicial resources.  The high cost of litigating these cases would dwarf any potential recovery for any individual defendant, and many employees would simply forgo vindicating their rights.  *Cf. Barbosa*, 2013 U.S. Dist. LEXIS 93194, at *33 ("The potential recovery by any individual plaintiff is relatively small and thus individual members of the class would likely be unwilling or unable to institute separate suits.").  For these reasons, the class action mechanism is superior to any alternatives, and plaintiffs meet the requirements of Rule 23(b)(3).

### D.    The Court Should Order Distribution of the Proposed Notice to the Class

Once the Court determines that preliminary approval is warranted, the Court must "direct notice in a reasonable manner to all class members who would be bound by the proposal." Fed. R. Civ. P. 23(e)(1).  The notice here, Exh. 2, contains all of

the required elements for a reasonable notice including: (1) the essential terms of the proposed settlement; (2) the nature of the case, the class definition and class claims; (3) how to make claims; (4) how to object or opt out; (5) the amount of the proposed service awards and attorneys' fees; (6) the time and place of the final fairness hearing; (7) the method for allocating settlement funds; (8) information that will enable class members to estimate their individual recovery, including an estimate of the net settlement fund and the size of the class; (9) contact information of class counsel and how to make inquiries; and (10) how to obtain additional information. Herbert B. Newberg, *et al*, Newberg on Class Actions § 8.17 (5th ed. 2013); *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 423 (6th Cir. 2012).

The proposed delivery method is also reasonable. Mailing notice to each member of a settlement class "who can be identified through reasonable effort" is presumptively reasonable and sufficient. *Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 176 (1974). Within 10 business days after preliminary approval, the Claims Administrator will use First Class Mail to send notice to class members at addresses provided to them by Schneider. Settlement ¶¶23, 24(a). If employee addresses have changed, and no forwarding address is available, the Claims Administrator will use an electronic search to identify their current address. *Id.* ¶24(a). A website with the proposed notice, in both English and Spanish, will also be available to class members. Teukolsky Decl. ¶62.

**E.    The Court Should Set a Final Approval Hearing**

The following schedule sets forth a proposed sequence for the relevant dates and deadlines. This schedule provides sufficient time for class members to evaluate the settlement and decide whether to participate. *See, e.g., Torrisi v. Tucson Elec. Power Co.*, 8 F.3d 1370, 1374-75 (9th Cir. 1993). This schedule also provides class members with sufficient time to evaluate plaintiffs' fee motion. *Mercury Interactive Corp. Sec. Litig. v. Mercury Interactive Corp.*, 618 F.3d 988, 993 (9th Cir. 2010).

| TIME PERIOD | EVENT |
|---|---|
| Within 5 business days after the Court enters an order granting preliminary approval: | Schneider to provide the Claims Administrator with the Class Member Information (as defined in the Settlement Agreement ¶23). |
| Within 5 business days after Schneider provides Class Member Information to Claims Administrator: | Claims administrator to mail class notice and claim form to all class members. |
| Within 30 days after class notice is mailed: | Plaintiffs to file motion for attorneys' fees and costs. |
| 40 calendar days after Class Notice is mailed: | Claims Administrator to mail reminder postcard. |
| 60 days after Class Notice is mailed: | Last day for class members to submit claims, exclude themselves, and give notice of objections. |
| 28 days before the final settlement approval hearing. | Plaintiffs to file motion for final approval and response to any objections. |
| To be determined, but no sooner than 120 days after class notice is mailed: | Final settlement approval hearing. |

## V.  CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court grant preliminary approval to the class settlement, provisionally certify the settlement class, appoint the plaintiffs as class representatives, appoint plaintiffs' counsel as class counsel, approve and direct the mailing of the proposed notice and claim form, and set a schedule for final approval proceedings consistent with the proposed schedule set forth above.


Dated: November 13, 2013                    Respectfully submitted,

                                            THERESA M. TRABER
                                            LAUREN TEUKOLSKY
                                            MARISA HERNANDEZ-STERN
                                            REBECCA PETERSON-FISHER
                                            Traber & Voorhees

                                            By: s/Lauren Teukolsky
                                            _____

                                                 Lauren Teukolsky
                                                 Attorneys for Plaintiffs