```
THERESA M. TRABER (SBN 116305)
LAUREN TEUKOLSKY (SBN 211381)
REBECCA PETERSON-FISHER (SBN 255359)
MARISA HERNANDEZ-STERN (SBN 272477)
Traber & Voorhees
128 N. Fair Oaks Avenue
Pasadena, California 91103
Telephone: (626) 585-9611
Facsimile: (626) 585-1400
tmt@tvlegal.com
lt@tvlegal.com
rpf@tvlegal.com
mhs@tvlegal.com
```

Attorneys for Plaintiffs Franklin Quezada, *et al.*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

EASTERN DIVISION

| | |
|---|---|
| FRANKLIN QUEZADA, et al.,<br><br>  Plaintiffs,<br><br>  v.<br><br>SCHNEIDER LOGISTICS TRANSLOADING & DISTRIBUTION, INC., et al.,<br><br>  Defendants. | Case No. CV 12-2188 CAS (DTBx)<br><br>**DECLARATION OF NAMED PLAINTIFF VICTOR RAMIREZ IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT**<br><br>Date:   None Set<br>Time:   None Set<br>Judge:  Hon. Christina A. Snyder |

Ramirez Declaration;.
Case No. CV 12-2188 CAS (DTBx)

# DECLARATION OF VICTOR RAMIREZ

I, Victor Ramirez, declare as follows:

1. The information contained in this declaration is based on my personal knowledge. If called as a witness, I could and would competently testify to the following matters.

2. I am a named plaintiff in this class action lawsuit. I have been a warehouse employee working in the warehouses located at 4100 and 4250 Hamner Avenue in Mira Loma/Eastvale, California for approximately the last eight years. Since approximately 2006, I have worked for Schneider Logistics Transloading & Distribution, Inc. ("Schneider"). Currently, I pull orders and do other tasks related to the operations of the warehouses.

3. I was present in June of 2008 when Schneider held a meeting to discuss switching to an alternative workweek schedule ("AWS" or "4-10 schedule"). The meeting was held entirely in English. No one from the company provided a simultaneous translation of what was being said or made themselves available after the meeting to answer questions in Spanish. I speak and understand only very basic English. Thus, what was said at the 4-10 meeting was very difficult for me to understand.

4. A few weeks after this meeting, an election was held to determine if we would go to the 4-10 schedule. Before the election I was not given anything in writing explaining the 4-10 schedule or its effects by managers or supervisors. I was also not given anything in writing about the 4-10 schedule at the informational meeting.

5. After the 4-10 schedule election, my schedule was not very regular. Instead of receiving ten-hours of work, four days-a-week as I was promised, my schedule depended entirely on the work that was available in the warehouses. Some days I was only offered six or eight hours of work, despite being ready and able to

perform ten. There were some days that I worked ten hours. During the "blitz," I sometimes would work for 12 hours or more. It was not often that I would come to work and know exactly how many hours I was working that day.

6. Before this lawsuit was filed, on days that I worked only eight hours I was not always provided with a second rest-break in the middle of my shift. I also sometimes did not get a rest break at all when I worked a shift that lasted between six and eight hours. On shifts lasting six to eight hours, I was typically not permitted or told to take a second rest break by my supervisors. For example, my shift start time was 5:00 AM, so if I worked an eight-hour shift, my end-time was 1:30 PM. If a second rest break was called, it was called at 1:15 PM. Sometimes I was told to work through that break by my supervisor, since I would be going home in fifteen minutes anyway. If I worked a seven-hour shift, I would end up leaving work at 12:30 and so a second break was not made available to me. Lastly, I was only allowed to take breaks when they were called over the PA or I was told by my supervisors.

7. Around the time the 4-10 informational meeting was held, a Schneider manager told me to sign a document that I later learned was a waiver stating that I was voluntarily waiving my right to all future second meal breaks when I worked shifts lasting between 10 and 12 hours. When I was made to sign the document, a Schneider manager told me that my refusal to sign would cost me my job with the company. The waiver form was in English and I did not understand what it said. Despite not knowing the content of the document that I was being forced to sign, I did so anyway because I did not want to lose my job. After that, I rarely took a second meal break when I worked between ten and twelve hours, as my supervisor told me that I was not allowed to.

8. Starting in late 2011, my supervisors started telling me to sign daily waivers related to meal breaks. My supervisor frequently forced me to sign meal break waivers at the end of my shift, or sometimes even days later, saying that I had

Ramirez Declaration;.
Case No. CV 12-2188 CAS (DTBx)        -2-

"voluntarily" waived my right to my meal breaks. In fact, I did not agree with what I was being told to sign because I did not understand it, and I had not actually made a choice to give up my meal break. Many times these forms were only in English and were not translated to me. Sometimes I signed because I was afraid and did not want to lose my job. Other times, I would write that I refused to sign because I was not voluntarily waiving any rights, but was being forced to do so.

9. I record the hours that I work by punching in and out using Schneider's time system. I was not aware that Schneider was deducting thirty minutes from my time records when I worked more than twelve hours, even if I did not take a second meal break.

10. Once we began working the 4-10 schedule, there were many days that I showed up for work, only to be told to go home because there was a Lack of Work ("LOW"). On LOW days, I would show up and the warehouse would be closed. My supervisor would tell me to go home or ask me to "volunteer" to go home. Sometimes my supervisor would force me to sign a document saying that I was volunteering to go home, which was not true. Schneider did not pay me reporting time pay on the days that I agreed to leave early. I was also not told that, by agreeing to leave before performing four hours of work, I was giving up my right to reporting time pay under California law.

11. In 2011, I began assisting the attorneys from Traber & Voorhees with their investigation of working conditions at Schneider.

12. In connection with this investigation, I provided the attorneys with employment documents, including numerous pay-stubs. I also provided them with the names of other current and former Schneider employees who I knew were also interested in pursuing claims against the company.

13. Between October 2011 and the filing of the complaint in March 2012, I met with my attorneys many times, both in person and over the phone, to discuss the investigation of the case.

14. In March of 2012, plaintiffs' counsel filed this lawsuit against Schneider. I agreed to be a lead plaintiff. Many co-workers associated with me with the lawsuit and some no longer spoke with me after learning of my involvement. I was often very scared of being retaliated against for my participation. Although I had worked for Schneider for many years before the lawsuit was filed, I thought that my involvement, coupled with even the smallest misstep, would cost me my job. This created a lot of pressure and stress for me in the workplace.

15. After the case was filed, I continued to assist the attorneys with their investigation. I assisted by attending numerous class meetings, speaking with my co-workers about the lawsuit, and answering discovery requests made to me. Since the lawsuit was filed, I have responded to 165 document requests from Schneider and 26 special interrogatories. To answer Schneider's discovery requests, I met with my attorneys multiple times in person and over the phone for several hours to verify my responses. I also searched my house for documents.

16. In June of 2013, I worked with my attorneys to prepare for my deposition. I used substantial time on my limited days off to prepare. On June 11, 2013, an attorney for Schneider took my deposition.

17. Throughout the case, including the settlement negotiations, I remained in regular communication with my attorneys to assist them with this lawsuit. I also frequently updated my attorneys about working conditions in the warehouses.

\\
\\

18. Lastly, I attended many class meetings, which were held approximately every six to eight weeks. In total, I estimate that I attended over eight class meeting with my attorneys to discuss case updates with interested class members.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this _16_ Day of October, 2013, in _ONTARIO_ California.

_____
Victor Ramirez

# DECLARATION OF TRANSLATION

I, Marisa Hernández-Stern, declare that I am fluent in both the English and Spanish languages. On October 15, 2013, I truthfully and correctly translated and read the foregoing **DECLARATION OF NAMED PLAINTIFF VICTOR RAMIREZ IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY APPROVAL OF SETTLEMENT** to Victor Ramirez before he signed it. He told me that he understood what I read to him. I declare under penalty of perjury under the laws of the State of California that this declaration is true.

Executed this 15 day of October, 2013, in Pasadena, California.

*[signature]*
Marisa Hernández-Stern